851 F.2d 229
 22 Soc.Sec.Rep.Ser. 312, Medicare&Medicaid Gu 37,179
VALLEJO GENERAL HOSPITAL (now known as Sutter Solano Medical
Center), Plaintiff-Appellant,
v.
Otis BOWEN, M.D., Secretary of Health and Human Services,
Defendant-Appellee.
 No. 87-1711.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 10, 1987.
Decided June 24, 1988.
 
 Florence L. Di Benedetto, Hanson, Bridgett, Marcus, Vlahos & Rudy, San Francisco, Cal., for plaintiff-appellant.
 Michael R. Power, Sp. Asst. U.S. Atty., Dept. of Health and Human Services, San Francisco, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before CHAMBERS, SKOPIL and POOLE, Circuit Judges.
 POOLE, Circuit Judge.
 
 
 1
 Appellant Vallejo General Hospital ("Vallejo") appeals from the District Court's grant of summary judgment in favor of the Secretary of Health and Human Services ("Secretary") in an action challenging the Secretary's decision to disallow reimbursement for certain depreciation and interest costs Vallejo claimed with respect to assets acquired from another Medicare provider. We affirm.
 
 I. BACKGROUND
 
 2
 Vallejo, now known as Sutter Solano Medical Center, is a non-profit hospital which provides services eligible for reimbursement under the Medicare program. In February 1979 Vallejo purchased the assets of Broadway Hospital, another Medicare provider, for $3,126,735. The purchase agreement contained an allocation schedule which divided the purchase price among seven groups of assets. This allocation schedule was developed by the seller and was added to the purchase agreement after the total price had been agreed upon.
 
 
 3
 The contract schedule allocated about 37% of the total purchase price to goodwill and other intangible assets which are not depreciable for Medicare reimbursement purposes. The remainder of the purchase price was allocated to equipment, land, buildings, and other improvements, grouped into six categories. Some categories combined reimbursable with non-reimbursable assets, without further breakdown.
 
 
 4
 Immediately following the purchase, Vallejo had the assets appraised. The appraiser valued the tangible assets at $4,301,235--substantially more than the total purchase price of $3,126,735, which included goodwill. Vallejo then allocated the total purchase price to the tangible assets only, according to the relative appraised value of those assets. No value was attributed to goodwill. Vallejo submitted its Medicare cost reports for the years 1979-82 using this allocation, rather than that set forth in the purchase agreement. These cost reports determined Vallejo's reimbursement for depreciation and interest costs associated with the acquired assets during the covered years.[1]
 
 
 5
 Vallejo's fiscal intermediary[2] initially accepted the appraisal-based allocation in the cost reports, but it eventually reversed its position after the seller filed a cost report using the allocation set forth in the purchase agreement. When one Medicare provider sells an asset to another provider, Medicare instructions require that the amount used by the seller to determine gain or loss on the sale agree with the historical cost used by the purchaser to establish the depreciable basis of the asset. See U.S. Dept. of Health and Human Services, Health Care Financing Administration, Providers Reimbursement Manual, Part I, Sec. 104.14 (1987). Accordingly, the fiscal intermediaries for Broadway and Vallejo were required to attempt to resolve their conflicting positions. When they were unable to do so, the Health Care Financing Administration ("HCFA") Regional Office informed Vallejo's intermediary that it should substitute the allocation in the purchase agreement for the one provided by Vallejo and adjust the reimbursement accordingly. Vallejo's intermediary complied, reducing the reimbursement by $431,892.
 
 
 6
 Pursuant to 42 U.S.C. Sec. 1395oo (a), Vallejo appealed to the Provider Reimbursement Review Board ("PRRB") challenging the intermediary's decision. The PRRB concluded that Vallejo was bound by the allocation in the purchase agreement and that the intermediary's adjustment was correct. Pursuant to 42 U.S.C. Sec. 1395oo (f) the Deputy Administrator of HCFA reviewed the PRRB decision on his own motion, and affirmed. Vallejo then sought review in the district court. The district court entered summary judgment in favor of the Secretary, and Vallejo appeals.
 
 II. STANDARD OF REVIEW
 
 7
 We review de novo a district court's award of summary judgment affirming a decision of the Secretary in a Medicare reimbursement matter. Phoenix Baptist Hosp. & Medical Center v. Heckler, 767 F.2d 1304, 1307,modified, 776 F.2d 877 (9th Cir.1985).
 
 
 8
 Pursuant to 42 U.S.C. Sec. 1395oo(f) we apply the standard of review applicable to actions arising under the Administrative Procedure Act. Review is limited to determining whether the Secretary's action was arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence on the record taken as a whole. North Clackamas Com. Hosp. v. Harris, 664 F.2d 701, 704 (9th Cir.1980). In addition, we give deference to the Secretary's interpretation of his own regulations. St. Elizabeth Com. Hosp. v. Heckler, 745 F.2d 587, 592 (9th Cir.1984). However, the Secretary's interpretation "must sensibly conform to the purpose and wording of the regulations," id. (quoting Pacific Coast Medical Enters. v. Harris, 633 F.2d 123, 131 (9th Cir.1980)), and must be a reasonable construction of the words in light of their previous interpretation and application. Id.
 
 III. GOVERNING REGULATIONS[3]
 
 9
 Vallejo agrees that 42 C.F.R. Sec. 405.415(g)(1) establishes the total purchase price as an upper limit on the aggregate depreciable basis of the assets acquired from Broadway Hospital. This regulation provides in pertinent part:
 
 
 10
 (1) The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, shall be the lowest of:
 
 
 11
 (i) The total price paid for the facility by the purchaser, as allocated to the individual assets of the facility ...
 
 
 12
 Vallejo notes that this regulation does not specifically address the manner in which the price is to be allocated to individual assets. It argues that the manner of allocation is addressed in 42 C.F.R. Sec. 405.415(f)(2)(iv) as follows:
 
 
 13
 If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider shall require an independent appraisal expert to establish the fair market value of each asset and shall make an allocation of the sales price in accordance with the appraisal.
 
 
 14
 According to Vallejo, the manner of allocation is governed either by 42 C.F.R. Sec. 405.415(f)(2)(iv), or, in the alternative, by Generally Accepted Accounting Principles ("GAAP"), and both methods require allocation based on relative fair market values as determined by appraisal.
 
 IV. DOCUMENTATION OF FAIR MARKET VALUE
 
 15
 Vallejo's argument rests largely on the provision that the seller's intermediary must call for an appraisal when there is "insufficient documentation" of the fair market value of the individual assets. 42 C.F.R. Sec. 405.415(f)(2)(iv). Vallejo understands this to mean that an allocation agreed to by the parties can be used only if there is documentation, independent of the agreement itself, showing that the allocation reflects the true economic value of the assets. It was stipulated that there was no such independent documentation in this case. Consequently, Vallejo believes it was proper to use the appraisal-based allocation in its cost reports.
 
 
 16
 The PRRB disagreed. It noted that fair market value is defined as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition." 42 C.F.R. Sec. 405.415(b)(2). It found that the purchase agreement was a valid and bona fide contract which met the definition of fair market value. The PRRB then concluded that 42 C.F.R. Sec. 405.415(f)(2)(iv), on which Vallejo sought to rely in substituting the appraisal-based allocation for the contractual one, was inapplicable for two reasons. First, the contract was explicit in attributing fair market value to each asset sold and was the best evidence of fair market value. Second, only the seller's intermediary may invoke the provision for requiring an appraisal, and the intermediary accepted the contract allocation instead. In affirming the PRRB decision, the Deputy Administrator of HCFA found that 42 C.F.R. Sec. 405.415(f)(2)(iv) does not require an appraiser to document fair market value in cases such as this, because the sales price agreed to by the parties is the real market value. He explained that it is in the interest of both parties bargaining rationally at arms-length to evaluate accurately the property increments. In his opinion the Deputy Administrator wrote, "The parties have opposite competing interests in the allocation, just as they have in the price itself. If the specified value of a depreciable component is overvalued, the seller must suffer recovery of depreciation allowances by the Medicare program. If the asset is undervalued, the buyer has a lower historical cost basis and will receive a diminished level of depreciation from Medicare."
 
 
 17
 On appeal Vallejo argues that the Secretary's decision to permit the use of contractual values violated the language and purpose of 42 C.F.R. Sec. 405.415(f)(2)(iv), and was arbitrary, capricious and an abuse of discretion. We do not agree. In our analysis we believe 42 C.F.R. Sec. 405.415(f)(2)(iv), read in conjunction with 42 C.F.R. Sec. 405.415(b)(2) defining fair market value, is reasonably susceptible of the meaning attributed to it by the Secretary. We cannot say that the Secretary's interpretation violates the language of that regulation.
 
 
 18
 Nor does the Secretary's interpretation violate the purpose of 42 C.F.R. Sec. 405.415(f)(2)(iv). The stated purpose is to "avoid unnecessary [appraisal] costs, while assuring accurate allocations of lump sum sales prices." 44 Fed.Reg. 3981-82 (Jan. 19, 1979). Earlier proposed drafts of the regulation required that the allocation of a lump sum sales price be based on an independent appraisal. Commentators objected that this requirement would unnecessarily increase costs; therefore the proposed regulation was amended to allow a buyer and seller to agree upon an allocation. Id. If the Secretary were now to honor those agreements only when they are supported by independent documentation, such as an appraisal, it would clearly defeat the purpose of the amended provision.
 
 
 19
 We conclude that it was not arbitrary, capricious or an abuse of discretion for the Secretary to rule that 42 C.F.R. Sec. 405.415(f)(2)(iv) allows the use of contractual figures to establish fair market value in this situation.
 
 V. SUBSTANTIAL EVIDENCE
 
 20
 Vallejo further contends that there was not substantial evidence to support the Secretary's ruling that the contractual allocation reflected the fair market value of the assets. Vallejo makes several points in support of this argument.
 
 
 21
 First, Vallejo notes that the parties stipulated that there was no independent documentation of the contractual values, and the intermediaries made no attempt to determine their accuracy. We believe the Secretary has adequately explained why additional documentation or verification was not required. A bona fide sale bargained for at arms-length can be expected to produce allocations which accurately reflect the true economic value of the assets.
 
 
 22
 Vallejo also points out that there was unrefuted evidence that the contractual allocation was not specifically negotiated, separate from other provisions of the contract. Consequently, in Vallejo's view the contractual allocation was not the result of arms-length bargaining. But Vallejo does not assert that it could not have negotiated this provision had it so wished. Nor does Vallejo explain its failure to do so. Absent some explanation, we can only conclude that Vallejo decided to accept the allocation schedule offered by Broadway, and that the schedule was the result of arms-length bargaining in the sense that it was an uncontested component of a contract which was negotiated as a whole.
 
 
 23
 Vallejo emphasizes that, standing alone, the contractual allocation was not sufficiently detailed for Medicare reimbursement purposes because it did not distinguish between reimbursable and nonreimbursable assets in certain categories. Vallejo believes this demonstrates that the contractual allocation was not intended to be used for Medicare reimbursement purposes.[4] We disagree. Reimbursement considerations would clearly be important in a transaction of this type, and Vallejo has not suggested any alternative purpose for agreeing to an allocation of the sales price. Furthermore, the seller's use of the contractual values in its cost report belies Vallejo's assertion about lack of intent.
 
 
 24
 Vallejo next argues that the independent appraisal provided evidence that the contractual allocation did not accurately reflect the fair market value of the assets. This is correct, but it is insufficient grounds on which to reverse the Secretary's decision. Under the "substantial evidence" standard of review, we must affirm a finding where there is such evidence as a reasonable mind might accept as adequate to support a conclusion, even if it is possible to draw two inconsistent conclusions from the evidence. St. Elizabeth, 745 F.2d at 592. Under this standard, the contract and the circumstances of its making were sufficient evidence from which to conclude that the contract allocation reflected the fair market value of the individual assets, even if those values were contradicted by the appraisal.
 
 VI. RELEVANCE OF GAAP AND TAX CASES
 
 25
 Vallejo argues in the alternative that if 42 C.F.R. Sec. 405.415(f)(2)(iv) is inapplicable, then the allocation must be determined by Generally Accepted Accounting Principles ("GAAP"). Under GAAP the allocation would be based on fair market value. Vallejo concludes that since its appraisal determined fair market values, the appraisal-based allocation should have been used instead of the contractual one. Vallejo also argues, apparently in support of its contention that the Secretary acted arbitrarily and capriciously, that the Secretary's decision is inconsistent with the treatment of acquired goodwill in tax cases.
 
 
 26
 Tax cases and GAAP would apply only if there were no internal basis or support for the Secretary's actions. Pacific Coast Medical Enters. v. Harris, 633 F.2d 123, 133 (9th Cir.1980). In this case the Secretary's actions are adequately supported by the language and purpose of the regulations, so we need not consider GAAP or the treatment of goodwill in tax cases.
 
 
 27
 The Secretary's decision is AFFIRMED.
 
 
 
 [1]
 Medicare reimburses providers for the reasonable cost of providing patient care as determined by the Secretary. 42 U.S.C. Secs. 1395f(b), 1395x(v)(1)(A) (1982). Among the costs Vallejo was entitled to recover were: (1) an allowance for the depreciation of tangible assets used in providing patient care, 42 C.F.R. Sec. 405.415 (1985), and (2) necessary and proper interest on indebtedness undertaken to finance acquisition of a facility used to provide patient care, except for that portion attributable to cost in excess of either historical cost as determined under 42 C.F.R. Sec. 405.415(b) or cost basis as determined under 42 C.F.R. Sec. 405.415(g), 42 C.F.R. Sec. 405.419 (1985)
 
 
 [2]
 Fiscal intermediaries are private entities (usually insurance companies) with whom the Secretary enters into agreements to oversee payments to Medicare providers. This practice is authorized by 42 U.S.C. Sec. 1395h(a). Providers file cost reports with their fiscal intermediary who analyzes and audits the report, then determines the amount of reimbursement
 
 
 [3]
 Certain sections of the Code of Federal Regulations which appeared in Title 42, Part 405, Subpart D at times pertinent to this decision have been redesignated as Part 413 of Title 42. We refer to the regulations by the old section numbers. Section 405.415, which governs here, has been redesignated as section 413.134
 
 
 [4]
 Vallejo points out the lack of detail in the contractual allocation primarily to demonstrate this lack of intent, but it also intimates, without directly arguing, that the Secretary could not require it to use the contract asset values in its cost report unless those values could stand alone. We do not decide this question because it is not directly raised on appeal and there is no indication that it was raised before the Secretary. We note, however, that we find nothing on the face of the regulation which would preclude the Secretary from supplementing the contractual allocation with other, more detailed documentation of relative asset values, including an appraisal conducted by an independent expert